THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
MASSACHUSETTS

Case No:_____ ___ __

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| Ex. Rel. Dale Meehan, | ) |
| | ) |
| Plaintiffs | ) COMPLAINT |
| | ) FILED UNDER SEAL |
| | ) DO NOT PLACE IN PRESS BOX |
| v. | ) DO NOT ENTER ON PACER |
| | ) |
| MEDSTAR AMBULANCE, INC.; | ) DEMAND FOR JURY |
| PIONEER VALLEY EMS, INC; | ) |
| MEDSTAR EMS, INC.; | ) |
| METROWEST EMERGENCY SERVICES, INC. | ) |
| AND FITCHBURG EMERGENCY MEDICAL | ) |
| SERVICES, INC. | ) |
| | ) |
| Defendants | ) |

## COMPLAINT AND JURY TRIAL DEMAND

Relator-Plaintiff Dale Meehan on behalf of herself and the United States of America,

alleges and asserts claims against: MedStar Ambulance, Inc. ("Defendant MedStar"); 2) Pioneer

Valley EMS, Inc.; 3) MedStar EMS, Inc.; 4) MetroWest Emergency Services, Inc.; and 5)

Fitchburg Emergency Medical Services, Inc. ( Hereinafter, all entities will be referred to herein

as "Defendants" or "MedStar Defendants").[1]

## JURSIDICTION AND VENUE

1. This action arises under The False Claims Act, 31 U.S.C. Sections 3729-33, The

False Claims Act and as such, this Court has jurisdiction pursuant to 28 U.S.C. Section 1331.

Jurisdiction is also authorized under 31 U.S.C. Sec. 3732(a).

---

[1] All have in common Gregory Melehov as President and his brother Nicholas Melehov in a position of other senior management such as Treasurer. Also, most of the corporate defendants have their corporate headquarters at 1000 Battles Street Leominster Ma. 01453 and all billing for all of the corporations is handled by the MedStar Ambulance Inc.'s billing personnel at 62 Washington Street, Worcester Ma. 01613.

2.   Venue lies within this judicial district pursuant to 31 U.S.C. Sec. 3732(a) because the Defendants transact substantial business in the Commonwealth of Massachusetts and are found here.  Additionally, as herein described, Defendants committed fraudulent acts within this judicial district. Also, Plaintiff-Relator, Dale Meehan is a citizen and resident of the State of Massachusetts.

## PARTIES

3.   Plaintiff-Relator Dale Meehan is an individual residing within the Commonwealth of Massachusetts. From March 26, 2012 through June 3, 2013, the Plaintiff-Relator was the Patient Account Representative for Defendant MedStar Ambulance Inc. at its Worcester office, 62 Washington Street, Worcester. Before that, from June 2005 to March 2012, the Plaintiff-Relator was the Billing Manager for Am-B-Care Ambulance, in Springfield Massachusetts (now defunct), which subcontracted ambulance work to the Defendant MedStar Entities,  including Defendant MedStar Ambulance, Inc. from approximately February 2011 until March 2012. During both periods of time, the Plaintiff- Relator observed numerous instances of fraudulent Medicare billing by the Defendant MedStar Entities, including Defendant MedStar Ambulance, Inc., as described in detail herein.

4.   Defendant MedStar Ambulance Inc., is a privately held Massachusetts Corporation with principal offices at 1000 Battles Street in Leominster Ma. 01452. Its President is Gregory Melehov and its Secretary is his brother Nicholas Melehov.

5. Pioneer Valley EMS Inc., is a privately held Massachusetts Corporation with principal offices at 399 Hampden Street Chicopee Ma. 01013 and a registered office address at Leo Cote, 34 North Maple Street Northampton Ma. 01062. Gregory Melehov is the President and Treasurer and Nicholas Melehov is the Secretary, Vice President and Director of the Corporation.

6. MedStar EMS, Inc. is a privately held Massachusetts corporation with principal offices at 1000 Battles Street, Leominster Ma. 01453. Gregory Melehov is the President and Director of the corporation and Nicholas Melehov is the Treasurer, Secretary and a Director of the corporation.

7. MetroWest Emergency Services, Inc., is a privately held Massachusetts corporation with principal offices at 1000 Battles Street, Leominster, Ma. 01453. Gregory Melehov is the President and a Director. Nicholas Melehov is the Treasurer, Secretary and also a Director.

8. Fitchburg Emergency Medical services, Inc. is a privately held Massachusetts corporation with principal offices at 1000 Battles Street, Leominster, Ma. 01453. Gregory Melehov is the President and Director and Nicholas Melehov is the Treasurer and Secretary and also a Director.

## MEDICARE COVERAGE FOR AMBULANCE SERVICES

9. Through the Medicare program administered by CMS, the United States provides health insurance to eligible citizens. See 43 U.S.C. sections 1395, et seq. Under Medicare "Part B" – Supplementary Medical Insurance for the Aged and Disabled –Medicare covers medically necessary ambulance services. Ambulance services are deemed medically necessary "if they are furnished to a beneficiary whose medical condition is such that other means of transportation are contraindicated." 42 CFR 410.40. Although "bed-confinement" is itself neither sufficient nor required as evidence of medical necessity, it is a "factor to be considered." Id. A Medicare beneficiary is bed confined if three requirements are met: "(i) the beneficiary is unable to get up from bed without assistance; (ii) the beneficiary is unable to ambulate; (iii) the beneficiary is unable to sit in a chair or wheelchair." Id.

3

10.     Medicare imposes an additional requirement for transportation of a person by ambulance in non-emergency, scheduled, repetitive ambulance services, such as dialysis transport. In addition to the ambulance service determining that medical necessity requirements are met, the ambulance service provider must also, before providing service, obtain a written order from the patient's physician certifying the medical necessity of ambulance transport. See 42 CFR 410.40(d)(2). Such order is valid for 60 days.

11.     Effective April 1, 2002, CMS established a fee schedule for ambulance services, replacing the previous "reasonable charge" billing procedure. See 42 CFR 414.601 et. seq. The fee schedule defines several different levels of ambulance service. Payment is made on the basis of services actually performed, rather than on the type of call or vehicle involved. For example, Basic Life Support (BSL) is defined as "transportation by ground ambulance vehicle and medically necessary supplies and services, plus the provision of BLS ambulance services," 42 CFR 414.604. Accordingly, ambulance provider are required to maintain all records demonstrating the medical necessity of transport services billed to Medicare and Medicaid, as well as the actual provision of a level of service requiring an ambulance.

## THE CMS- 1500 FORM

12.     In order to bill the Medicare Program, a provider must submit an electronic or hard copy claim form called a CMS-1500. When the CMS-1500 form is submitted, the provider certifies that the services in question were "medically indicated and necessary for the health of the patient."

13.     On the CMS-1500 form the provider must state the procedures for which it is billing Medicare, the identity of the patient, the provider name and a brief narrative explaining the diagnosis and the medical necessity of the services rendered.

4

14.     All health care providers, including ambulance services, must comply with applicable statutes, regulations and guidelines in order to be reimbursed by Medicare Part B.

15.     A provider has a duty to have knowledge of the statutes, regulations and guidelines regarding coverage for the Medicare services, including but not limited to the following;

> a. Medicare reimburses only reasonable and necessary medical services furbished to beneficiaries. See 42 U.S.C. Sec. 1395y(a)(1)(A); and
>
> b. Medicare regulations exclude from payment services that are not reasonable and necessary. See 42 C.F.R. Sec 411.15 (k)(1).

16.     Medicare generally makes payment without review of the medical documentation in reliance upon the veracity of providers' certification included on the Medicare claim form.

## DEFENDANTS' FRAUDULENT SCHEMES TO BILL THE UNITED STATES FOR UNNECESSARY AMBULANCE SERVICES

17.     Through a purposeful and systematic scheme of falsifying Medicare-required documents and records, the Defendants fraudulently billed the United States for services that patients do not require.

18.     The Defendants knowingly and fraudulently billed Medicare for ambulance services by, among other things: 1) mischaracterizing the ambulance services as requiring advanced life support (ALS) for the purpose of billing Medicare a higher amount for reimbursement but which did not require ALS; 2) Billing Medicare for ambulance transportation services when an ambulance was not medically necessary for the patient; 3) Billing Medicare for ambulance services provided for transportation to patients for non-Medicare covered services, for example from a nursing home to a doctor's office for a regular doctor's appointment; 4)

Double-billing both Medigap and ambulance patients at the same time for the same services. For example, in case of Medicare B patients, the Defendants would bill Medicare Some amounts not be covered by Medicare. The Defendants would bill the residual amounts both to Medigap and the patient. In many cases both the patients and Medigap would pay but the Defendants that residual amount but MedStar would purposefully not reimburse the overpaid amount, unless the patient specifically called and requested reimbursements; 5) Upcoding the transports to be billed as an emergency service when the transport was not in fact an emergency service; 6) Altering the actual pickup and destination, fraudulently making the service billable to Medicare, when in reality it was not. For example, pick-ups from physicians' offices with destination modifier (P) on the paperwork, are not covered by Medicare so the destination modifier would be changed to Hospital (H) which is a covered service and; 7) Fraudulently billing Medicare for "intercept" services (so called) which fell under contracts with municipalities and for which the municipalities were supposed to bill Medicare. This resulted in higher ambulance service costs to Medicare. See below for more details.

19.     The Plaintiff-Relator asserts that the fraudulent schemes and billing practices described herein concerning the MedStar entities occurred from at least 2005 through 2013.

## FRAUDULENT BILLING OF AMBULANCE RUNS TO TRANSPORT PATIENTS FROM NURSING HOME OR ASSISTED LIVING TO OR FROM DOCTOR'S APPOINTMENTS

20. Medicare B does not reimburse patients who are transported from a nursing home or Assisted Living Facility to their regular doctor's appointments. Despite this, the Plaintiff-Relator saw several instances in which the Defendant MedStar Ambulance Inc. billed Medicare for just such services.

21. For example, the Plaintiff-Relator observed that On March 7, 2013, "Patient 1",

was transported to and from the Golden Living Center in Fitchburg to see her urologist, whose office is located within the Leominster Hospital, for a pre-scheduled routine medical appointment. The disposition shows that the patient was treated and transported "for a urologist dr. apt…transportation priority routine." The Narrative states "dispatched to golden living center for… female pt being transported to Leominster hospital for a urologist dr. apt. u/a found pt in bed, moved to stretcher via sheet slide…u/a to dr. office move pt to office room and waited with pt for visit." The report also says that the patient was not bed confined and that she was able to ambulate. Defendant MedStar Ambulance Inc. of Leominster, charged $1000 for round trip transporting and $130 additional for mileage. Patient 1 has Medicare HMO Blue and these charges were paid by Medicare.

22. Item 31 on the Forms 1500's requires the "SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDNG DEGREES OR CREDENTIALS. Item 31 on the Form 1500 of "Patient 1" is signed by one of the Defendant MedStar Ambulance Inc.'s President Nicholas Melehov, dated 03/13/2011. On the reverse side, the document states: "I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as expressly permitted by Medicare or CHAMPUS regulations…." The same form says: "NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds and that any false claims, statements, or documents or concealment of a material fact may be prosecuted under applicable Federal or state laws. The Plaintiff- Relator observed numerous identical instances of fraudulent billing by

MedStar entities, specifically for transportation of patients to and from their doctors appointments.

23. "Patient 2", 72 was transported by ambulance by Defendant MedStar Ambulance Inc. from The Whittier Rehabilitation Hospital inWestborough on 9.19.11 for a routine medical appointment."Patient 2" was also transported back to Whittier. The patient is covered by Medicare. "Patient 2" was able to ambulate and was not bed confined, according to the Patient Care Report. Medicare was billed for these runs.

25. "Patient 3", 87, was transported by ambulance from the Kindred Hospital in Natick to the Framingham Union Hospital on 10.19.11 by the Defendant MedStar Ambulance, Inc. for a routine medical appointment, according to the Patient Care Report. The patient was also transported by ambulance back to Kindred Hospital. The records also indicate that he did not require a stretcher, was able to ambulate and was not bed confined. "Patient 3" had Blue Cross Blue Shield. The Plaintiff-Relator believes, on information, that Blue Cross was reimbursed by Medicare.

26."Patient 4", 77, was transported from St. Camillus Health Center in Whitinsville, to the Hahnemann Hospital for surgery on her wrist on 4.6.11 by the Defendant MedStar Ambulance, Inc.. There was also a return trip by ambulance. "Patient 4" was covered by Medicare which was billed for these services. According to the Patient Care Reports, the patient was not bed confined, was able to ambulate and did not require a stretcher. Medicare was charged $670 each way.

27. "Patient 5", 85, was transported by ambulance by the Defendant MedStar Ambulance, Inc. from Christopher House in Worcester to Umass University Hospital in Worcester for a battery replacement for his pacemaker. He was then transported by ambulance

8

back to Christopher House. "Patient 5" is covered by Medicare which was billed for these runs. The Patient Care Report indicates that the visit was routine, that he was not bed ridden, was able to ambulate and did not require a stretcher.

28. "Patient 6", 74 was transported by the Defendant MedStar Ambulance, Inc. from Kindred Hospital Natick to a doctor's appointment in Boston. He was also transported by ambulance back to Kindred Hospital after his doctor's appointment. According to the Patient Care Report, he was ambulatory, was not bed confined. He was covered by Blue Cross and the Plaintiff –Relator believes, on information, that Medicare reimbursed Blue Cross.

29. "Patient 7", 89, was transported by ambulance by the Defendant MedStar Ambulance, Inc. on 1.25.2011 from the Golden Living Center in Worcester to State Opticians Worcester for a routine eye examination and then transported by ambulance by the same Defendant back to the Golden Living Center. "Patient 7" is covered by Medicare, which was billed for these runs.

30. "Patient 8," 88, was transported by ambulance by the Defendant MedStar Ambulance, Inc. from the Whittier Rehab Hospital to the Framingham Union Hospital on 8.26.11 for a routine echo-cardiogram. The patient was then transported back to Whittier by ambulance by the same defendant. The Patient Care Records show that the patient was not bed-ridden and did not require a stretcher. "Patient 8" was covered by Medicare under Medicare PPO Blue and Medicare was billed over $757 for these runs. Records also indicate that this patient was transported by the same Defendant by ambulance on various other occasions for which Medicare was also billed, including on 8.12.11.

### TRANSPORTING DIALYSIS PATIENTS TO AND FROM ROUTINE TREATMENTS WITHOUT MEDICAL NECESSITY FOR AMBULANCE SERVICES AND FRAUDULENT BILLING TO MEDICARE

31. Medicare also does not cover ambulance service for kidney dialysis patients to or from their dialysis appointments unless a medical need for an ambulance is demonstrated. This means that the patient is physically unable to ride sitting up for some medical reason. Yet the relator also observed that MedStar entities would bill for transporting dialysis patients to and from their pre-scheduled dialysis appointments.

32. For example, on March 1, 2011, "Patient 9," 68, was transported by ambulance, by the Defendant MedStar Ambulance, Inc. from the Christopher House Nursing Home in Worcester Ma, to DaVita's dialysis in Worcester for her routine dialysis appointment. The Patient Care Report says: "M38 TO CHRISTOPHER HOUSE FOR THE 68 YO FEMALE WITH GENERAL WEAKNESS AND RENAL FAILURE GOING TO DIALYSIS. U/A PT ABLE TO AMBULATE TO STRETCHER WITH ASSIST. ..." A Provider Detail Advisory from Blue Cross states: "A-OUR RECORDS INDICATE THAT MEDICARE IS THE PRIMARY PAYOR ON THIS MEMBER'S CLAIMS. PLEASE BILL MEDICARE FIRST AND PUT THE PATIENT'S BLUE CROSS AND BLUE SHIELD IDENTIFICATION NUMBER IN THE "OTHER INSURANCE" BLOCK." Medicare was billed for these runs and several others for "Patient 9" for dialysis treatments for dialysis appointments 03/03/2011 through 03/12/2011. All of the attached documents relating to "Patient 9" show that there was no medical need for her to ride in an ambulance.

33. The Form 1500 for the March 1, 2011 ambulance transports were signed by Nick Melehov in item 31 and the total round trip ambulance service was $1060 billed to Medicare.

34. On 2.24.11 "Patient 10," 68, was transported by ambulance by the Defendant

MedStar Ambulance, Inc. from Sterling Village in Sterling Ma. to Umass Memorial Medical Center for his dialysis treatment. He was then transported back to Sterling Village by ambulance by the same Defendant. Patient care records show that the patient was not bed-ridden, was able to ambulate and did not require a stretcher. There was no medical necessity for an ambulance. Also attached are documents showing ambulance runs and fraudulent billing for "Patient 10" for dialysis appointments 02/16/2013 through 03/4/2011. "Patient 10" had Blue Cross. The Plaintiff-Relator, on information believes that Blue Cross was reimbursed by Medicare.

35.    On 1.8.11 "Patient 11," 77, was transported by ambulance from the Golden Living Center in Fitchburg to the DaVita Fitchburg Dialysis Center, by the Defendant MedStar Ambulance, Inc., for dialysis. Then he was transported by ambulance by the Defendant back to the Golden Living Center.  No medical need is demonstrated in the Patient Care Reports which state that he was not bed confined, could ambulate and did not require a stretcher. "Patient 11" is covered by Medicare, which was billed $608 for the runs.

### FRAUDULENTLY BILLING MEDICARE B DIRECTLY INSTEAD OF BILLING HOSPITALS FOR AMBULANCES FOR INDIVIDUALS WHO WERE IN PATIENT UNDER MEDICARE A

36.    One form of fraudulent billing by the Defendant MedStar Ambulance, Inc., observed by the Relator, was for hospital to hospital transports of individuals who were "inpatient" in a hospital and receiving care under the provisions of Medicare Part A. When a person is in a hospital receiving care billed under Medicare A, the hospitals bill Medicare for a bundle of services as required by Medicare regulations. The hospitals do not bill for individual services such as ambulance transportation. As such, the hospitals contracted with the MedStar entities for transportation of the in-patient Medicare A individuals and the ambulance companies

11

are supposed to bill the hospital for their services in order to receive a "contract rate" for their services. The relator saw however, that the Medstar entities billed Medicare directly, even though they were not supposed to do so.[2]

37.     For example, the Plaintiff-Relator recalls a number of such patient ambulance transports by the Defendant MedStar Ambulance, Inc.from Kindred Parkview Hospital to Baystate Medical Center in Springfield Massachusetts. She recalls seeing this practices several times in 2012 and 2013 when she was posting Medicare payments.

38.     The Relator immediately brought this to the attention of her supervisor and asked why MedStar had billed Medicare directly when the transports were from a long term care facility to a hospital or hospital to hospital. Her supervisor told her that this is just "the way MedStar does it and the way John Melehov has wanted it done."

39.     In some cases, the relator saw that  the same individuals  were being transported by ambulance, by the Defendant MedStar Ambulance, Inc. from one hospital to another hospital for specialized care, upto three times a week for many patients, on pre-scheduled runs. These transports clearly fell under the hospital contract and the hospital should have been billed Medicare directly. This was the case, for example with wound care patients who require their dialysis procedures three times a week. However the relator observed that each time, instead of sending a bill to the hospital under the hospital contract, which would mean payment of $300, Medstar billed Medicare directly under Medicare B and the payment received from Medicare was much higher, approximately $1200. In addition, the MedStar entities including the Defendant MEdStar Ambulance, Inc. would bill mileage to Medicare, which was

---

[2] Ambulance services are separately payable only under Part B. There are certain circumstances in which the service is covered and payable as a beneficiary transportation service under Part A; however in this case the service cannot be classified and paid for as an ambulance service under Part B. It must be part of the total hospital services billing under Medicare Part A. CMS Manual.

paid and which would not have been paid under the contract rate for Medicare A patients which were supposed to be billed by the hospitals, as mentioned.

40. The Plaintiff-Relator observed that a significant percentage of ambulance transports of patients admitted to hospitals and falling under Medicare A, were billed directly to Medicare B instead of to the hospitals, increasing MedStar ambulance, Inc.'s Medicare reimbursement to approximately $1200. The Plaintiff- Relator estimates that in excess of 30% of all billings for all MedStar entities including Defendant Medstar Ambulancec, Inc., were improperly billed directly to Medicare in the manner described here. A separate reason for MedStar entities to bill Medicare directly instead of the hospitals, is that this fraudulent method evades the hospital audits which would reveal the upcoded charges.

41. Even after she was told that the MedStar way was to bill Medicare B for Medicare A patients, the Plaintiff- Relator continued her attempts to correct these billings. Each time, her changes were altered so that the bills would issue to Medicare B. Some of the fraudulent billings involved patients who were at the Whittier Rehabilitation facility in Westborough. On information, the Plaintiff-Relator believes that the only person who could or would have billed Medicare B knowing that the patient was in patient and as such Medicare A, was the Medstar (and MedStar entities') Billing Manager John Melehov.

## UPCODING ORDINARY PATIENT TRANSPORTS TO EMERGENCY CARE AND FRAUDULENTLY BILLING MEDICARE

42. The relator also observed fraudulent billing in the form of  upcoding of pre-scheduled (ordinary) transports to emergency transports. (code A0427).  A call would come in for a scheduled run, the ambulance would transport the patient and the Plaintiff- Relator saw on the run-sheets that nothing unusual had occurred and there was no emergency and yet the run had been upcoded to an emergency. Most were from the Parkman Special Care Hospital to the

13

Case 1:13-cv-12495-IT   Document 1   Filed 10/04/13   Page 14 of 22

BayState Medical Center. The others were from hospital to hospital to hospital or hospital to Dr's appointments." All of the billing and upcoding was done electronically. They were not errors or mistake. As with the other fraudulent billing practices, the Plaintiff-Relator tried to get the company to change the fraudulent coding and it would not. When she tried to change things back to the correct billing, he changes were undone.

43. Medicare regulations require that to bill Medicare for an emergency transport – Code HCPCS A0429 (BLS) or A0427 (ALS), the service itself must be an emergency, where the health of the patient is in danger, for example if bleeding, in severe pain, in shock or unconscious. An emergency response is also one that, at the time the ambulance supplier is called, it responds immediately. An immediate response is one in which the ambulance begins as quickly as possible to take the steps necessary to respond to the call." See CMS Ambulance Billing Guide . Medicare, pays greater amounts for emergency ambulance runs than, for example basic medical services (BMS).

## UPGRADING CHAIR-VAN TRANSPORTS TO AMBULANCE FOR THE PURPOSE OF FRAUDULENTLY BILLING MEDICARE

44. Chairvan transports, in which individuals are transported in a van which accommodates a wheelchair, are an excluded service under Medicare. Even though Medicare specifically says it does not pay for chairvan transports, the Plaintiff-Relator observed numerous instances in which the chairvan service was upgraded to appear as an ambulance run for the patients.

45. In the fall of 2012 around October, a facility called the billing office for transportation for a patient. The Plaintiff-Relator believes that the run was from a Sterling Village in Sterling, Ma. Sterling Village is a skilled nursing facility and rehabilitation center providing medical, nursing and rehabilitation services on a long term care basis. The Plaintiff-

14

Relator observed that employees at Sterling were friendly with her supervisor. The Plaintiff-Relator overheard a conversation between her supervisor and a Sterling Village employee. The person asked for a chair-van and Plaintiff-Relator's supervisor began to ask questions about the patient. The Plaintiff-Relator heard her say: "well that can be an ambulance. The medical necessity form just needs to be signed by one of the nurses at the facility." From then on, The Plaintiff-Relator noticed that the chair-van transports were frequently changed to ambulance runs *on paper*, even though the transports were actually done by chair-van. Plaintiff-Relator mentioned this to her supervisor and was told that this is what she had been instructed to do by John Melehov.

## UPCODING AMBULANCE SERVICES

46. Around March of 2013, the Plaintiff-Relator was assigned to examine submissions to and from Medicare Blue. This consisted of applying payments and making notations of the reasons for any denials by Medicare.  At that time, the Plaintiff-Relator began to observe scores of obviously fraudulent Medicare billings on a daily basis. These included: a) mischaracterizing routine pre-scheduled ambulance transports as emergency ambulance service by "upcoding" the runs on the billing form 1500; b) mischaracterizing routine transports as advanced life support(ALS) by "upcoding" the runs on the billing form 1500; c) double-billing patients  by not reimbursing overpayments when funds received from two sources; d) mischaracterizing  chair-van transports as ambulance transports through upcoding and e) up-coding advanced life support(ALS) runs to be Specialty Care Transport (SCT), the highest level of reimbursement in Medicare for ambulance runs, by "upcoding", even though the SCT was not required on the runs and f) Billing ambulance runs directly to Medicare B instead of billing hospitals directly for ambulance services for hospitals for individuals who were inpatient under

Medicare A. All of these fraudulent billing practices which occurred when the Plaintiff-Relator was working for MedStar and resulted in significant over-billing to Medicare and were apparent in their design to increase company profits.

### UPCODING SERVICES TO ADVANCED LIFE SUPPORT TO INCREASE BILLING RATE

47. In addition to seeing MedStar entities including Defendant MedStar Ambulance, Inc. upcode the ambulance service from basic service to emergency service, Plaintiff-Relator also observed on various occasions that the company would upcode basic ambulance service to Advanced Life Support, (ALS) even though the run was basic transport and not providing advanced life support. ALS receives the highest level of reimbursements from Medicare.

48. One ambulance run for which the Plaintiff-Relator has documents concerned "Patient 11" of Sterling Massachusetts. "Patient 11"According to the MedStar Ambulance Inc. Patient Care Report, was transported for a follow up on calf surgery. He was transported by MedStar Ambulance, Inc. on 1.25.11 from Beth Israel Deaconess Hospital in Boston to Whittier Rehabilitation Hospital in Westborough Massachusetts. According the report narrative, "Patient 11" remained on the stretcher for the consult and was taken back to Whittier without incident. Billing was through Blue Cross Medicare and the billing certification on the form 1500 was signed by Nick Melehov on 2.3.2011. As such, Medicare paid for this ambulance service as well as the service by MedStar Ambulance Inc. taking "Patient 11" from Whittier to Beth Israel. The diagnosis listed on the form 1500 was 136.9 infection unspecified and 786.09 shortness of breath. The ambulance run from Beth Israel was billed as *advanced life support* non emergency base rate A0426 which amounted to $800 plus an additional *$330 for mileage.*

49. According to the Ambulance Billing Guide, HCPCS A0426 Advanced Life

Support, Level 1 Non-emergency is:

> "transportation by ground ambulance vehicle, and the provision of
> medically necessary supplies and services including an ALS assessment
> By ALS personnel or at least one ALS intervention. Advanced Life
> Support assessment is an aassessment performed by an ALS crew as part of an
> emergency response that was necessary because the patient's reported condition
> at the time of dispatch was such that only an ALS crew was qualified to perform
> the assessment."

The only assessment listed on the run sheet was that the "Patient 11's" airway was patent,

he did not have any fluid loss and his neurological signs were normal.

## FRAUDULENT BILLING IN COLLECTION OF DOUBLE PAYMENTS

50. In addition to the other forms of fraudulent billing, MedStar had a scheme

in which it would collect double payments, observed by the Plaintiff- Relator.

51. If Medicare covers an ambulance trip, it will pay 80% of the Medicare-approved

amount after the patient meets the yearly part-B deductible. Frequently, the patients transported

by Defendant MedStar Ambulance, Inc. carried secondary insurance which would pay the

additional 20%. However, Defendant Medstar Ambulance, Inc. had a policy of billing the

patient the 20% which was not covered by Medicare and if they received an overpayment,

moneys from the patient and moneys from the patient's insurer, Defendant MedStar Ambulance,

Inc's policy was never to reimburse the patient unless they called to ask for the money. This

policy was specifically told to the Plaintiff-Relator by her supervisor Neyda Caraballo. She said:

"The insurance company may recoup overpaid amounts but the patients do not, unless they or a

family member call Medstar and even then, they must go through Greg Melehov."

## FRAUDULENT BILLING FOR AMBULANCE SERVICE FOR "INTERCEPT" AMBULANCE RUNS

52. During the time she was at Am-B-Care and later at MedStar, the Plaintiff-

Relator observed that frequently, municipal ambulance services operating only basic life support level services would contact MedStar entities, including Defendant MedStar Ambulance, Inc. seeking an advanced life support level service ambulance to intercept their transport en-route when a paramedical level treatment was required for a patient. This practice called for Medstar entities including MedStar Ambulance, Inc. to invoice the municipality entity a specific amount, as set forth in a contract between Medstar ambulance, Inc. and the municipality. The contracted amount with municipalities is known to the Plaintiff-Relator, to be between $250-$275 for each run. Then, the municipality would invoice the appropriate insurer or Medicare utilizing the patient trip information provided to the municipality by Defendant MEdstar Ambulance, Inc.. That is the way the billing process should have been handled by MedStar. It was not, however, how The Defendant MedStar Ambulance, Inc. handled it.

53. The MedStar entities including MedStar Ambulance, Inc. were contracted by The Chicopee Fire Department, Coastal Billing of Sutton Ma which bills for various municipalities; Comstar of Rowley, the Leominster Fire Department and the Fitchburg Fire Department. With regard to the "intercepts," the Plaintiff-Relator observed that MedStar entities would invoice the Patient's insurer or Medicare directly for the full amount of the transport, or approximately $1200 plus mileaage for each run. The Plaintiff-Relator saw this happen a minimum of thirty (30) times during the time she worked for MedStar.

54. When the municipalities would request the run-sheets from MedStar Ambulance, Inc. in order to complete their billing submittal, the company would simply would not respond to these requests. This was specifically observed by the Plaintiff-Relator. In fact, the Plaintiff-Relator herself received three calls from the City of Chicopee's biller Sue Baez, requesting information on the intercept runs for billing purposes in the years 2012 and 2013. The

Plaintiff-Relator recalled as well that Ms. Baez complained that John Melehov wouldn't respond to her phone calls, emails or faxes. The Plaintiff-Relator has seen John Melehov throw away faxed requests for this information and when the Plaintiff-Relator requested clarification of the process on these requests from her supervisor, Neyda, she was told "we just don't return those run sheets." This resulted in over-billing to Medicare in some instances as the rate paid to the municipalities is lower than the rate paid by Medicare to Defendant MedStar Ambulance, Inc. the difference being as much as $2000 per run.

55. When the Plaintiff-Relator was completing her insurance audit for Defendant MedStar Ambulance Inc., she would correct the entries which were mis-coded on the intercepts. At least fifteen times, she found trips that were mis-coded and a Medstar Ambulance Inc.'s transport was billed to Medicare when it should have been coded as an intercept and billed to the municipality. The Plaintiff-Relator saw that in each case, a correction had been made, changing back her correction to reflect that Medstar Ambulance, Inc. was the transporting service and that the insurer or Medicare had paid the full price.

## COUNT ONE
## FALSE CLAIMS ACT 31 U.S.C. Sec. 3729

56. Plaintiff-Relator adopts and incorporates by reference the previous paragraphs as if set forth fully herein.

57. By and through the fraudulent schemes described, the Defendants including Medstar Ambulance, Inc., knowingly by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information, presented or caused to be presented false or fraudulent claims to the United states for payment or approval and knowingly made, or caused to be made  or used false records or statements material to a false or fraudulent claims paid or approved by the United States as hereinbefore described.

58. By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial. The United States relied upon the statements of the Defendants including Defendant MedStar Ambulance Inc. and as a result paid claims, it otherwise would not have paid, had it known that the billings made or caused to be made to the United States were fraudulent.

## COUNT TWO
## FALSE CLAIMS ACT 31 U.S.C. Sec. 3729 (a)(1)(B)

59. Plaintiff-Relator adopts and incorporates t reference the previous paragraphs as if set forth fully herein.

60. By virtue of the acts described above, the Defendants knowingly made or used a false record or statement to get a false or fraudulent Medicare claim paid or approved by the United States, in violation of the False Claims Act 31 U.S.C. sec. 3729(a)(1)(B)

61. As a result, the Defendants were unjustly enriched at the expense of the United States and are liable to account and pay such amounts or proceeds therefrom which are to be determined at trial.   The United States relied upon the statements of the Defendants including Defendant MedStar Ambulance Inc. and as a result paid claims, it otherwise would not have paid, had it known that the billings made or caused to be made to the United States were fraudulent.

## COUNT THREE
## RETALIATION IN VIOLATION OF 31 U.S.C. SECTION 3730(h)

62.     Relators re-allege all paragraphs above as if set forth herein.

63.   In June,2013 after her continued questions about fraudulent Medicare billing

and attempts to correct the billing documentation, the Plaintiff-Relator was terminated from her position by Defendant MedStar Ambulance, Inc.This termination was a violation of 31 U.S.C. Sec 3730(h).

      64. As a direct and proximate result of this unlawful termination, Plaintiff-Relator has suffered emotional pain and mental anguish together with serious economic hardship including lost wages and special damages.

      65. As a direct and proximate result of this unlawful and discriminatory harassment and termination, by the defendant MedStar Ambulance, Inc. the Plaintiff-Relator has suffered emotional pain and mental anguish together with serious economic hardship including lost wages and special damages and also her career pathway has been damaged and set off track which will result in further economic harm in the forseeable future.

      WHEREFORE, the Plaintiff-Relator on behalf of the United States and herself, requests this Court to enter judgment against defendants as follows:

      a.  That the U.S. be awarded damages in the amount of three times the damages sustained by the U.S. because of the false claims and fraud alleged within this Complaint.

      b.  That civil penalties of $11,000 be imposed for each and every false claim that defendant presented to the U.S. or caused to be presented;

      c.  That pre and post judgment interest be awarded, along with reasonable attorneys fees costs and expenses;

      d.  That the Plaintiff-Relator be awarded the maximum amount allowed under law;

      e.  That for Count Three the Plaintiff-Relator be granted all relief

necessary to make her whole including but not limited to two times back pay, loss of future income, special damages and other damages as well as counsel fees and costs;

      f.  Counsel fees;

      g.  Further relief that the Court deems proper.

The Plaintiff-Relator
By Her Counsel,

_____ 10.4.2013
Jeffrey A. Newman (BBO # 370450)
Law Offices of Jeffrey A. Newman
One Story Terrace
Marblehead, Ma. 01945
617-823-3217
Jeffrey.Newman1@gmail.com